990 F.2d 1413
 61 USLW 2676, 16 Employee Benefits Cas. 1904
 Robert J. COAR,
v.
Joseph KAZIMIR, Rocco Morongello, in their capacity as
Trustees of the Pension Fund--Mid Jersey Trucking
Industry--Local 701; William Levine, in his capacity as
Trustee of the Pension Fund--Mid Jersey Trucking
Industry--Local 701; Donato DeSanti, in his capacity as
Trustee of the Pension Fund--Mid Jersey Trucking
Industry--Local 701; Robert Dudik, in his capacity as
Trustee of the Pension Fund--Mid Jersey Trucking
Industry--Local 701; Pension Fund--Mid-Jersey Trucking
Industry--Local 701,
Joseph Kazimir, Rocco Morongello, William Levine, Donato
DeSanti and Robert Dudik, in their capacity as Trustees of
the Pension Fund--Mid-Jersey Trucking Industry--Local 701
and the Pension Fund--Mid-Jersey Trucking Industry--Local
701, Appellants in Nos. 92-5356 and 92-5438.
Robert J. COAR
v.
Joseph KAZIMIR, Rocco Morongello, in their capacity as
Trustees of the Pension Fund--Mid Jersey Trucking
Industry--Local 701; William Levine, in his capacity as
Trustee of the Pension Fund--Mid Jersey Trucking
Industry--Local 701; Donato DeSanti, in his capacity as
Trustee of the Pension Fund--Mid Jersey Trucking
Industry--Local 701; Robert Dudik, in his capacity as
Trustee of the Pension Fund--Mid Jersey Trucking
Industry--Local 701; Pension Fund--Mid Jersey Local 701,
Robert Coar, Appellant in Nos. 92-5359 and 92-5439.
 Nos. 92-5356, 92-5359, 92-5438, 92-5439.
 United States Court of Appeals,
Third Circuit.
 Argued March 9, 1993.
Decided April 15, 1993.
Sur Petition for Rehearing May 11, 1993.
 
 Michael R. Perle (argued), Hayden, Perle & Silber, Weehauken, NJ, for appellee-cross-appellant Robert J. Coar.
 Roger B. Kaplan (argued), Wilentz, Goldman & Spitzer, Woodbridge, NJ, for appellants-cross-appellees.
 Before: BECKER, GREENBERG, and WEIS, Circuit Judges.
 OPINION OF THE COURT
 GREENBERG, Circuit Judge.
 
 I. FACTUAL AND PROCEDURAL BACKGROUND
 
 1
 Defendants Joseph Kazimir, Rocco Morongello, William Levine, Donato DeSanti, and Robert Dudik, as trustees of the Pension Fund of Mid-Jersey Trucking Local 701 (the Pension Fund), and the Pension Fund itself, together called the "Fund Defendants," appeal from the district court's order of June 23, 1992, granting summary judgment to plaintiff Robert J. Coar, a former trustee and a beneficiary of the Pension Fund, in his suit seeking a declaration that the Pension Fund's actions in withholding his vested pension benefits and applying them as a set-off to his liability to the fund violated the anti-alienation provision of the Employee Retirement Income Security Act of 1974 (ERISA), section 206(d)(1), 29 U.S.C. § 1056(d)(1). Coar cross-appeals from the district court's denial of his motion for an award of attorney's fees. Because we conclude that Coar cannot invoke ERISA's anti-alienation provision to shield his benefits from liability for breach of his duty to the Pension Fund, we will reverse the district court's grant of summary judgment and dismiss his appeal of the district court's order denying attorney's fees as moot.
 
 
 2
 The undisputed facts are as follows. In 1986, Coar, a former trustee, and current participant, of the Pension Fund was convicted, along with Frank Scotto, his co-trustee, and Kenneth Zauber, the general counsel to the Pension Fund, of engaging in a RICO conspiracy to receive kickbacks in exchange for channeling $20 million from the Pension Fund's assets to Omni Funding Group, a Florida-based mortgage company.[1] See United States v. Zauber, 857 F.2d 137, 140, 149-53 (3d Cir.1988), cert. denied, 489 U.S. 1066, 109 S.Ct. 1340, 103 L.Ed.2d 810 (1989). In October 1984, prior to the indictment, the Pension Fund and its trustees had filed a civil case against Coar, his co-conspirators, and certain other defendants, alleging ERISA and RICO violations arising from the Omni investment. On September 13, 1990, the district court in the civil case granted summary judgment on liability to the Pension Fund and the trustees against Coar and certain of the other defendants.
 
 
 3
 Pursuant to its Findings of Fact and Conclusions of Law Concerning Damages in the fund's civil case, the district court ultimately entered a final, unappealed judgment against Coar for $25,535,887 for fiduciary duty violations under ERISA sections 409(a) and 502(a)(3), and a judgment for $96,607,661 for RICO violations. The district court explained that the $25,535,887 figure represented the difference between what the Pension Fund recovered on its investment with Omni, or received from settlements in litigation to recover its assets, and what it would have earned "had those monies continued to be invested with the Pension fund's other investment managers." On April 16, 1991, prior to the entry of final judgment against Coar, but after the district court found Coar liable, the Pension Fund advised Coar that it would set off Coar's liability to the Pension Fund against his benefits from the fund, beginning with the May 1991 benefits.[2]
 
 
 4
 On July 17, 1991, Coar filed this action against the Fund to obtain his benefits relying on section 502(a)(1) of ERISA, 29 U.S.C. § 1132(a)(1). Coar claimed that the Pension Fund's withholding of benefits violated the non-forfeiture and anti-alienation provisions of ERISA, sections 203(a) and 206(d)(1), 29 U.S.C. §§ 1053(a) and 1056(d)(1). The Fund Defendants answered and filed a counterclaim seeking a declaratory judgment that the Pension Fund's withholding of benefits under sections 409(a) and 502(a)(3) of ERISA, 29 U.S.C. §§ 1109(a) and 1132(a)(3), did not violate ERISA's non-forfeiture and anti-alienation provisions. The parties each subsequently moved for summary judgment.
 
 
 5
 On May 12, 1992, the district court filed an opinion holding that, although the non-forfeiture provision of ERISA did not bar the set-off, the anti-alienation provision forbade an equitable set-off by the Pension Fund of its damages against Coar. See Coar v. Kazimir, 792 F.Supp. 345 (D.N.J.1992). While the district court recognized that the Supreme Court's holding in Guidry v. Sheet Metal Workers Nat'l Pension Fund, 493 U.S. 365, 110 S.Ct. 680, 107 L.Ed.2d 782 (1990), expressly left open the issue of whether section 206(d)(1) of ERISA forecloses a pension fund from setting off benefits to a beneficiary who breached a fiduciary duty to the fund, it nevertheless found that Guidry 's "reasoning [counseled] a strict application of the anti-alienation provision" precluding a set-off by the Pension Fund in this case. Id. at 351. Accordingly, the district court denied the Fund Defendants' motion for summary judgment and granted summary judgment to Coar. Id. The court also awarded Coar attorney's fees under section 502(g)(1) of ERISA, 29 U.S.C. § 1132(g)(1), with the amount to be fixed after an affidavit of services was filed. Id. at n. 11.
 
 
 6
 On May 20, 1992, pursuant to Fed.R.Civ.P. 59, the Fund Defendants moved for reconsideration of the summary judgment decision and the attorney's fees award.[3] In an order entered June 23, 1992, the district court reaffirmed the summary judgment for Coar but, on reconsideration, denied an award of fees. The district court then entered judgment for Coar on June 23, 1992.
 
 
 7
 On June 29 and July 8, 1992, the Fund Defendants and Coar respectively filed notices of appeal and cross-appeal from the order of June 23, 1992. Coar filed his cross-appeal notwithstanding his prior filing, on July 2, 1992, of a motion in the district court, pursuant to Rule 59(e), to have the court reconsider its denial of his request for attorney's fees. The district court denied Coar's motion for reconsideration on July 31, 1992. On August 5 and August 11, 1992, the Fund Defendants and Coar respectively filed second notices of appeal and cross-appeal. On August 13, 1992, we consolidated all four appeals.
 
 II. JURISDICTION
 
 8
 We have jurisdiction pursuant to 28 U.S.C. § 1291. The district court had subject matter jurisdiction pursuant to 29 U.S.C. § 1132(e) (ERISA) and 28 U.S.C. § 1331. We further note that our appellate jurisdiction over the Fund Defendants' first appeal from the summary judgment was not terminated when Coar served his timely motion pursuant to Fed.R.Civ.P. 59(e), notwithstanding Fed.R.App.P. 4(a)(4) which provides that "[a] notice of appeal filed before the disposition of [such motion] shall have no effect." In this case, Rule 4(a)(4) does not impair our jurisdiction inasmuch as Coar's Rule 59(e) motion related exclusively to the district court's denial of attorney's fees, and did not concern the merits of the final judgment of the district court. See Buchanan v. Stanships, Inc., 485 U.S. 265, 268-69, 108 S.Ct. 1130, 1132, 99 L.Ed.2d 289 (1988). Furthermore, though Coar's first notice of cross-appeal was ineffective because it was filed while his motion for reconsideration was pending, we nevertheless have jurisdiction over his cross-appeal because he filed a timely second notice of cross-appeal following the district court's denial of his motion for reconsideration.
 
 III. STANDARD OF REVIEW
 
 9
 We exercise plenary review of the order granting summary judgment to Coar and denying it to the Fund Defendants. In most cases an appellate court reversing an order granting summary judgment will not direct the district court to enter judgment in favor of the appellant, because a genuine issue of fact will remain. Kreimer v. Bureau of Police for Town of Morristown, 958 F.2d 1242, 1250 (3d Cir.1992); First Nat'l Bank v. Lincoln National Life Ins. Co., 824 F.2d 277, 281 (3d Cir.1987). However, when the appeal concerns only issues of law, and there are no material facts in dispute as in this case, we are free to enter an order directing entry of summary judgment in favor of the appellant. Kreimer, 958 F.2d at 1250; Nazay v. Miller, 949 F.2d 1323, 1328 (3d Cir.1991); First Nat'l Bank, 824 F.2d at 281.
 
 IV. DISCUSSION
 
 10
 In enacting ERISA, Congress established a comprehensive remedial scheme for the protection of:
 
 
 11
 the interests of participants in employee benefit plans and their beneficiaries ... by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts. ERISA § 2(b), 29 U.S.C. § 1001(b).
 
 
 12
 Section 409(a) of ERISA, mandates that a person breaching duties to a pension plan "shall be personally liable to make good to such plan any losses to the plan resulting from each such breach ... and shall be subject to such other equitable or remedial relief as the court may deem appropriate." 29 U.S.C. § 1109(a). Section 502(a) in turn authorizes the Secretary of Labor and any plan participant, beneficiary, or fiduciary to bring a civil action "for appropriate relief under section " or to obtain an injunction or "other appropriate equitable relief" to redress a fiduciary violation. 29 U.S.C. § 1132(a).
 
 
 13
 However, ERISA's anti-alienation provision, section 206(d)(1), requires, "Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated."[4] 29 U.S.C. § 1056(d)(1). Coar argues that this provision prevents the Pension Fund from setting off his benefits pursuant to section 409(a). Thus, he contends that the issue before us is whether section 409(a) overrides section 206(d)(1).[5]
 
 
 14
 We start our analysis with the Supreme Court's opinion in Guidry. Guidry, the chief executive officer of a union and the trustee of its pension plans, pled guilty to embezzling funds from the union. The union subsequently brought a civil action in which Guidry was found liable. In formulating a remedy, the district court imposed a constructive trust on Guidry's pension benefits and the court of appeals affirmed, in reliance on section 409(a) of ERISA. The Supreme Court reversed.
 
 
 15
 The Court stated that because the union and pension plans were distinct legal entities and Guidry was found liable only for his breach of duty to the union, "[w]e need not decide whether the remedial provisions contained in § 409(a) supersede the bar on alienation in § 206(d)(1), since [Guidry] has not been found to have breached any fraudulent duty to the pension plans." 493 U.S. at 373, 110 S.Ct. at 685 (emphasis in original). Thus, the Court held that "the Court of Appeals erred in invoking § 409(a)'s remedial provisions." 493 U.S. at 374, 110 S.Ct. at 686. The union, recognizing that section 409(a) could not serve as the basis for the set-off in the absence of a breach of duty owed to the pension plan, instead relied on the remedial provisions of the Labor-Management Reporting and Disclosure Act (LMRDA). Section 501(a) of the LMRDA states that a union's officers "occupy positions of trust in relation to such organization and its members as a group" and therefore have a duty "to hold its money and property solely for the benefit of the organization and its members." 29 U.S.C. § 501(a). Section 501(b) creates a private right of action for union members "to recover damages or secure an accounting or other appropriate relief for the benefit of the labor organization." 29 U.S.C. § 501(b). The union argued that this provision authorized the imposition of a constructive trust which supersedes ERISA's prohibition on the alienation of pension benefits. 493 U.S. at 373, 110 S.Ct. at 686.
 
 
 16
 In rejecting this argument, the Court stated that "[i]t is an elementary tenet of statutory construction that '[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one....' " 493 U.S. at 375, 110 S.Ct. at 687 (quoting Morton v. Mancari, 417 U.S. 535, 550-51, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974)). The Court therefore did "not believe that congressional intent would be effectuated by reading the LMRDA's general reference to 'other appropriate relief' as overriding an express, specific congressional directive [in ERISA] that pension benefits not be subject to assignment or alienation." Id. Rather, it reconciled the two statutes by holding that "the LMRDA determined what sort of judgment the aggrieved party may obtain," while ERISA's section 206(d)(1) related only to "the narrow question of whether that judgment may be collected through a particular means--a constructive trust placed on the pension." 493 U.S. at 375, 110 S.Ct. at 687 (emphasis in original).
 
 
 17
 The Court also declined to accept the union's position that equitable principles might support the establishment of the constructive trust:
 
 
 18
 Nor do we think it appropriate to approve any generalized equitable exception--either for employee malfeasance or for criminal misconduct--to ERISA's prohibition on the assignment or alienation of pension benefits. Section 206(d) reflects a considered congressional policy choice, a decision to safeguard a stream of income for pensioners (and their dependents, who may be and perhaps usually are, blameless), even if that decision prevents others from securing relief for the wrongs done to them. If exceptions to this policy are to be made, it is for Congress to undertake that task. Id. at 375, 110 S.Ct. at 687.
 
 
 19
 The Court predicated its holding in this regard on its treatment of section 206(d)(1) as an antigarnishment provision and its view of the constructive trust imposed by the district court as a form of garnishment. Furthermore, the Court thought that an equitable exception would eviscerate the provision for it would be difficult to refuse to recognize other exceptions, as courts almost always would think it equitable to garnish the benefits of a wrongdoer on behalf of an innocent creditor. The Court explained:
 
 
 20
 As a general matter, courts should be loath to announce equitable exceptions to legislative requirements or prohibitions that are unqualified by the statutory text. The creation of such exceptions, in our view, would be especially problematic in the context of an antigarnishment provision. Such a provision acts, by definition, to hinder the collection of a lawful debt. A restriction on garnishment therefore can be defended only on the view that the effectuation of certain broad social policies sometimes takes precedence over the desire to do equity between particular parties. It makes little sense to adopt such a policy and then to refuse enforcement whenever enforcement appears inequitable. A court attempting to carve out an exception that would not swallow the rule would be forced to determine whether application of the rule in particular circumstances would be 'especially' inequitable. The impracticability of defining such a standard reinforces our conclusion that the identification of any exception should be left to Congress. 493 U.S. at 376-77, 110 S.Ct. at 687 (emphasis in original).
 
 
 21
 The few cases, both before and after Guidry, considering the relationship between section 409(a) and section 206(d)(1) have come to conflicting results. Before Guidry the Court of Appeals for the District of Columbia Circuit held that the rule against alienation was not "immutable" where a plan trustee breached his fiduciary duty to the plan. Crawford v. La Boucherie Bernard Ltd., 815 F.2d 117 (D.C.Cir.1987), cert. denied, 484 U.S. 943, 108 S.Ct. 328, 98 L.Ed.2d 355 (1988). In reaching this conclusion, the court turned first to the language in section 409(a), finding it to have given courts "broad authority ... to fashion remedies redressing any breach and for protecting the interests of participants and beneficiaries." Id. at 119. Crawford also relied on ERISA's legislative history, which indicated that ERISA's remedial provisions were intended to "make applicable the law of trusts; ... to establish uniform fiduciary standards to prevent transactions which dissipate or endanger trust assets." Id. at 120 (citing 120 Cong.Rec. S-15737, Aug. 22, 1974, reprinted in 1974 U.S.C.C.A.N. 4639, 5177, 5186). Having determined from the legislative history that the common law of trusts applied, the court then cited the well-established principle that when a trustee who also is a beneficiary of the trust breaches his fiduciary duty to the trust, the other beneficiaries can force the trustee to make good his breach from his beneficial interest in the trust. 815 F.2d at 120 (citing Bogert, Trusts & Trustees, § 191 at 484 (2d. ed. 1979); III Scott on Trusts § 257, at 2201 (3d ed. 1967)).
 
 
 22
 Finally, the Crawford court relied on several cases which had recognized exceptions to section 206(d)(1) based on equitable principles. For example, it noted that the Court of Appeals for the Eleventh Circuit had excepted from section 206(d)(1)'s reach liabilities arising from the employee's criminal conduct towards his employer, see St. Paul Fire & Marine Ins. Co. v. Cox, 752 F.2d 550, 552 (11th Cir.1985), and that other cases had permitted garnishment of benefits to satisfy family support and community property obligations. See, e.g., AT & T v. Merry, 592 F.2d 118 (2d Cir.1979); Stone v. Stone, 450 F.Supp. 919 (N.D.Cal.1978), aff'd, 632 F.2d 740 (9th Cir.1980), cert. denied, 453 U.S. 922, 101 S.Ct. 3158, 69 L.Ed.2d 1004 (1981).
 
 
 23
 After Guidry, a district court agreed with Crawford that section 409(a) authorizes a set-off notwithstanding section 206(d)(1). Pension Benefit Guar. Corp. v. Solmsen, 743 F.Supp. 125 (E.D.N.Y.1990).[6] In Solmsen a trustee/beneficiary was found liable to the fund for failing to forward employee and employer contributions to the plan. In formulating a remedy, the district court ordered a set-off of the trustee's benefits. In so doing, the court cited Crawford for the proposition that "[t]he remedy of set-off in fiduciary breach cases has been recognized as a narrow exception to the anti-alienation provision." Id. at 129. The court commented further:
 
 
 24
 ERISA's legislative history and common sense suggest that set off is permissible. No good reason appears as to why [the plan] should have to pay benefits to a person who has wronged the Plan, and the beneficiaries of it, before he made good the wrong. Id.
 
 
 25
 The court also concluded that Guidry did not compel a contrary result given the Supreme Court's express refusal to decide whether a fund could set off from pension payments its claim against a beneficiary. Although the Solmsen court did not discuss the language in Guidry regarding the undesirability of creating an equitable exception to section 409(a), it evidently did not consider that language directed to a circumstance in which the trustee/beneficiary was liable to the fund.
 
 
 26
 However, unlike the Solmsen court, the United States Court of Appeals for the Fifth Circuit, predicted that "[b]ased upon Guidry's strict application of the anti-alienation provision" the Supreme Court would not find the language in section 409(a) expansive enough to supersede the anti-alienation provision. Herberger v. Shanbaum, 897 F.2d 801, 804 (5th Cir.) cert. denied, 498 U.S. 817, 111 S.Ct. 60, 112 L.Ed.2d 35 (1990). That court thus declined to follow Crawford as it considered that Guidry had undermined much of the reasoning in Crawford. Id. In particular, Herberger found Crawford 's reliance on ERISA's legislative history no longer to be persuasive, given that Guidry found no justification to create an exception to the anti-alienation provision. Herberger deduced that if the Supreme Court believed that the legislative history warranted an equitable exception to the anti-alienation provision, it would have said as much.
 
 
 27
 Herberger also observed that the Supreme Court in Guidry rejected holdings in some of the cases relied on by Crawford to support the proposition that the anti-alienation provision is not "immutable." For example, Guidry stated that an employee's criminal misconduct cannot be the basis for a set-off, which is contrary to the holding in St. Paul Fire & Marine, upon which Crawford relied. In addition, Guidry recognized that "qualified domestic relations orders" now are authorized by an express statutory anti-alienation exception. Therefore, in the Herberger court's view, the domestic relations cases cited by Crawford no longer supported the Crawford court's decision to create a judicial exception to the anti-alienation provision. "To the contrary, the fact that Congress amended the statute to allow this exception lends support to the notion that Congress will create exceptions where it sees fit and courts should not do so." 897 F.2d at 804.
 
 
 28
 In the case before us, the district court agreed with Herberger that Guidry 's discussion of the anti-alienation provision essentially had overruled Crawford, suggesting that the provision was indeed immutable. First, the district court observed that LMRDA section 501(b) ("or other appropriate relief") was similar to ERISA's section 409(a) ("and shall be subject to such other equitable or remedial relief as the court may deem appropriate"). 792 F.Supp. at 349. The district court inferred from this similarity that if the Supreme Court did not find LMRDA's language expansive enough to supersede the anti-alienation provision, it would be unlikely to find section 409(a)'s language sufficient either. Second, the district court felt bound by the Supreme Court's declaration that in passing the anti-alienation provision Congress had made a considered and clear decision to safeguard pension rights. In this regard, the district court, closely tracking Herberger, cited the amendment to ERISA excepting certain domestic relations orders from the anti-alienation provision as evidence that Congress will create policy-oriented exceptions where appropriate. The court found its refusal thus far to do so in cases of the type before us leads to a negative inference. Id. at 350. The court, therefore, declared that "despite the natural distaste for permitting a beneficiary who has wronged the pension fund to collect benefits, a legislative policy determination has been made and the statute ... is clear." Id. at 351.
 
 
 29
 We decline to follow this reasoning because we think it construes Guidry's holding too broadly and places insufficient emphasis on the wording of sections 409(a) and 206(d)(1) and ERISA's legislative history. This case fundamentally differs from Guidry for here, unlike the Supreme Court in Guidry, we are analyzing two provisions in the same statute. We therefore are obliged to reconcile these provisions and to apply both without undermining either's purpose for, "In interpreting language in one section of a statute in conjunction with language of other sections, [a] court strives to find a reading that is consistent with the purposes of the entire statute considered as a whole." Pyramid Lake Paiute Tribe of Indians v. United States Dep't of Navy, 898 F.2d 1410, 1416 n. 15 (9th Cir.1990).
 
 
 30
 Nothing in section 206(d)(1) suggests that Congress intended that provision to limit the remedies afforded to beneficiaries under section 409(a) or in any way to protect unscrupulous fiduciaries. Neither does the legislative history of section 206(d)(1), which courts have described as "sparse," Ellis Nat'l Bank v. Irving Trust Co., 786 F.2d 466, 470 (2d Cir.1986), and inconclusive, General Motors Corp. v. Buha, 623 F.2d 455, 460 (6th Cir.1980), indicate that a dishonest trustee should be shielded from the consequences of a breach of fiduciary duty. On the contrary, the "only available [legislative] history," Northwest Airlines, Inc. v. Roemer, 603 F.Supp. 7, 9 (D.Minn.1984), states that the objective of the provision was "[t]o further ensure that the employee's accrued benefits are actually available for retirement purposes...." H.R.Rep. No. 807, 93d Cong., 2d Sess. (1974), reprinted in 1974 U.S.C.C.A.N. 4639, 4734. If, as indicated by the legislative history, the anti-alienation provision is intended "to protect plan beneficiaries by ensuring that plan assets are used only for payment of benefits" we think that Congress's purpose "would be undermined, not advanced, by an interpretation that prohibited offset under these circumstances," because the Pension Fund's assets would be dissipated further through payments to those who had looted the fund rather than being preserved for the beneficiaries' use. Crawford, 815 F.2d at 122.
 
 
 31
 We note further that Guidry did not state that section 206(d)(1) is immutable. Rather, the Court's main reason for not overriding the anti-alienation provision through the LMRDA was that the LMRDA's provision was general whereas the anti-alienation provision in ERISA was specific. This reasoning, however, does not support the district court's conclusion in this case, and actually suggests the opposite result, because section 409(a) is more specific than both the anti-alienation provision in ERISA and the LMRDA provision. Section 409(a) expressly states that the trustee who violates a fiduciary duty to the plan must make good to the plan. It therefore imposes a specific obligation upon the trustee to return misappropriated assets to the beneficiaries. Section 409(a) also directs the courts to ensure that the wayward trustee fulfills this obligation to make restitution through whatever remedy the court deems appropriate in the circumstances ("such other equitable or remedial relief as the court might deem appropriate"). In contrast, the anti-alienation provision speaks only in the most general terms.
 
 
 32
 Consequently, under Guidry's reasoning, the more specific language of section 409(a) serves as a better indicator of congressional intent than the general language of section 206(d)(1). Thus, section 409(a) should "not be controlled or nullified" by the anti-alienation provision. See also Clifford F. MacEvoy Co. v. United States ex rel. Calvin Tompkins Co., 322 U.S. 102, 64 S.Ct. 890, 88 L.Ed. 1163 (1944) (applying rule that when a specific and general provision conflict, the specific terms and language prevail); Gallenstein v. United States, 975 F.2d 286, 290 (6th Cir.1992) (holding that when construing a general enactment and a more particular enactment within the same statute, and when the plain language of the two subsections cannot be otherwise reconciled, the more specific subsection should be given effect); Markair, Inc. v. Civil Aeronautics Bd., 744 F.2d 1383, 1385 (9th Cir.1984) (reciting "the well-settled rule of statutory construction that specific terms of a statute override the general terms").
 
 
 33
 Therefore, given section 409(a)'s express mandate that trustees undo any harm they have done to the pension plan, and the absence of any language in section 206(d)(1) or its legislative history limiting the range of options granted to the courts under ERISA to see that this is done, we do not believe that Congress intended the anti-alienation provision to dilute the potential relief available to pension beneficiaries. Instead, we read section 206(d)(1) and, by extension Guidry, as shielding only the beneficiaries' interest under the pension plan from third-party creditors.
 
 
 34
 We also find it significant that the legislative history to section 206(d)(1) speaks of "a garnishment or levy," H.R.Conf.Rep. No. 1280, 93d Cong., 2d Sess. (1974), reprinted in 1974 U.S.C.C.A.N. 5038, 5061, and that Guidry, as we have indicated, refers to section 206(d)(1) as an "anti-garnishment provision." Garnishment connotes a triangular relationship among a debtor, creditor, and third party, in which the creditor levies on some asset owed to the debtor by a third party. See, e.g., Western v. Hodgson, 494 F.2d 379, 382-83 (4th Cir.1974) (finding that "[u]nder most State statutes, the term 'garnishment' denotes a proceeding whereby a plaintiff seeks to subject to his claim property of the defendant in the hands of a third person, or money owed by a third person to the defendant") (emphasis added); Atwater v. Roudebush, 452 F.Supp. 622, 631 (N.D.Ill.1976) (distinguishing between set-off and garnishment); Black's Law Dictionary 680 (6th ed. 1990) (defining garnishment as "[a] proceeding whereby a plaintiff creditor, i.e., garnishor seeks to subject to his or her claim the property or money of a third party, i.e., garnishee, owed by such party to defendant debtor, i.e., principal defendant"); 7 C.J.S. Attachment § 2 (1980) ("Generally speaking, garnishment is but a form of attachment.... However, attachment and garnishment differ in character in that attachment is directed against property of the principal defendant which is his possession or under his control, while the object of garnishment is to reach an indebtedness due to the principal defendant by a third person, or property in the possession or control of a third person, which belongs to the principal defendant.") (emphasis added).[7]
 
 
 35
 Courts therefore usually would not understand "garnishment" as meaning a set-off of a trustee's benefits by a pension plan itself. For this reason, we believe that Congress and the Supreme Court intended that the term "garnishment" have its usual meaning as an action taken against an asset by a third-party creditor, and not as an action taken by a creditor itself to set off its own obligation against a debt due it. This construction is supported by AT & T v. Merry, 592 F.2d at 124, which indicated that the purpose of section 206(d)(1) "is to protect an employee from his own financial imprudence in dealings with third parties."
 
 
 36
 The controlling "anti-alienation" regulations issued by the Internal Revenue Service and relied on by Guidry, 493 U.S. at 685 n. 10, 110 S.Ct. at 685 n. 10 (quoting 26 C.F.R. § 1.401(a)-13(b)(1) (1989)), further clarify this distinction between a set-off of benefits by the plan and a garnishment of benefits by an outsider. The regulations define alienation or garnishment as "[a]ny arrangement providing for the payment to the employer of plan benefits which otherwise would be due to the participant under the plan," or "whereby a party acquires from a participant or beneficiary a right or interest enforceable against the plan in, or to, ... a plan benefit payment." See 26 C.F.R. § 1.401(a)-13(c)(1) (1992) (emphasis added). Furthermore, they specifically exclude from ERISA's anti-alienation bar actions by the pension plan itself to apply or set off vested pension benefits to recover debts owed by the participant to the plan as a result of a prior overpayment of benefits or as a result of the failure by a participant to repay a debt to the plan. See 26 C.F.R. §§ 1.401(a)-13(c)(2)(iii) and (d)(2) (1992). Hence, the regulations clearly comprehend "garnishment" or "alienation" as referring to actions by third parties, such as a beneficiary's employer or creditors, and not as recoupment by the pension plan.[8]
 
 
 37
 The fact is that under the construction in the IRS regulations of the anti-alienation provision we are not even concerned with section 409(a), for when the Pension Fund, without Coar's consent, set off the benefits due to him against his debt to it there was simply not an alienation within section 206(d)(1).[9] Indeed, it seems to us that a court would have to stretch section 206(d)(1), which merely requires that the plan provide that benefits "not be assigned or alienated," to encompass a set-off which in the context of this case was nothing more than the Pension Fund's refusal to make payments.
 
 
 38
 We note also that from a policy point of view our reading of section 206(d)(1), as barring only the alienation of benefits to third parties, is not inconsistent with the Supreme Court's concern in Guidry against creating any equitable exceptions to an "anti-garnishment" rule. If the Supreme Court ruled otherwise, it would have invited all sorts of third-party claims against pension funds. Courts would have found it impossible to distinguish the equities of one claim from any other, and ultimately would have rendered the anti-garnishment provision nugatory. No such danger exists here. A holding that section 409(a) trumps the "anti-garnishment" rule in this case, which as we have explained is not even necessary to sustain the Fund Defendants' position, would create only one narrowly defined class of excepted claimants--namely, the fund and thus effectively the beneficiaries themselves, the very persons ERISA was designed to protect.[10] Such a holding certainly would not "approve any generalized equitable exception" to section 206(d)(1). Guidry, 493 U.S. at 375, 110 S.Ct. at 687.
 
 
 39
 The legislative history discounted by Herberger also leads us to read Guidry as we do. The Herberger court stated that Guidry undermined the notion that the legislative history of ERISA supports the application of trust law to authorize a set-off through section 409(a). Yet, Guidry did nothing of the sort. Because Guidry did not concern a breach of duty to a trust, the Supreme Court had no reason to consider the traditional principle that a beneficiary and trustee who breaches a fiduciary duty to the trust may forfeit his or her benefits, and did not even mention the legislative history cited by Crawford. Moreover, the Supreme Court previously has read the legislative history of ERISA as requiring the application of traditional trust law in the administration of the statute, see Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 110, 109 S.Ct. 948, 954, 103 L.Ed.2d 80 (1989), and has anticipated that "a federal common law of rights and obligations under ERISA-regulated plans would develop." Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 56, 107 S.Ct. 1549, 1559, 95 L.Ed.2d 39 (1987). Accord Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 65-66, 107 S.Ct. 1542, 1547-48, 95 L.Ed.2d 55 (1987); Franchise Tax Bd. v. Construction Laborers Vacation Trust, 463 U.S. 1, 24 n. 26, 103 S.Ct. 2841, 2854 n. 26, 77 L.Ed.2d 420 (1983). Therefore, the legislative history relied on by Crawford continues to have relevance on the issue of whether section 409(a) authorizes a set-off of the benefits of a trustee who is liable to the fund.
 
 
 40
 In this regard, the Report of the Senate Committee on Labor and Public Welfare states:
 
 
 41
 The enforcement provisions have been designed specifically to provide both the Secretary and participants and beneficiaries with broad remedies for redressing or preventing violations.... The intent of the committee is to provide the full range of legal and equitable remedies available in both state and federal courts.
 
 
 42
 S.Rep. No. 93-127, 93d Cong., 1st Sess. (1974), reprinted in 1974 U.S.C.C.A.N. 4639, 4838, 4871 (emphasis added). Similarly, Senator Harrison A. Williams expressly stated that the congressional intent was for ERISA to codify the principles of traditional trust law:
 
 
 43
 The objectives of these provisions are to make applicable the law of trusts; ... to establish uniform fiduciary standards to prevent transactions which dissipate or endanger plan assets, and to provide effective remedies for breaches of trust. 120 Cong.Rec. S-15737, Aug. 22, 1974, reprinted in 1974 U.S.C.C.A.N. 5177, 5186 (emphasis added).
 
 
 44
 Thus, permitting the set-off in this case would effectuate Congress's intent, by making available to the Pension Fund a common law remedy utilized in pre-ERISA days by state and federal courts for breaches of trust. See, e.g., In re Watson, 449 N.E.2d 1156 (Ind.Ct.App.1983) (holding that successor trustee properly applied former trustee's undistributed income to satisfy prior judgment for improper distribution of trust corpus); In re Van Nostrand's Will, 177 Misc. 1, 29 N.Y.S.2d 857, 865 (N.Y.Sur.Ct.1941) (placing equitable lien upon the beneficial interest of a trustee/beneficiary who had embezzled trust property to compensate wronged beneficiaries of the trust); In re Burr's Estate, 143 Misc. 877, 257 N.Y.S. 654 (N.Y.Sur.Ct.1932) (holding that a trustee properly withheld trust payments owed to a prior trustee who had misappropriated trust funds), aff'd, 239 A.D. 774, 263 N.Y.S. 945 (N.Y.App.Div.1933);[11] Restatement (Second) of Trusts § 257 (1959) ("If a trustee who is also one of the beneficiaries commits a breach of trust, the other beneficiaries are entitled to a charge upon his beneficial interest to secure their claims against him for the breach of trust, unless the settlor manifested a different intention.").
 
 
 45
 Considering that Congress stated that it wanted pre-ERISA trust law applied to ERISA's remedial provisions; that this pre-ERISA law provides for a set-off in the circumstances of our case; and that the remedial provision at issue, section 409(a), expressly requires the trustee breaching his or her fiduciary duty to make good to the plan, we believe that Congress did not intend to allow an individual such as Coar to collect pension benefits prior to satisfying his liabilities to the fund. Indeed, a contrary reading would permit dishonest trustees, such as Coar, "who repeatedly and indeed blatantly breached their fiduciary duties to the pension plan" to evade their obligations to the fund and would result in "[p]lan members and their families [having] to watch their pension monies disappear once again into the [dishonest trustees'] pockets." Crawford, 815 F.2d at 121.[12] We cannot understand how such a result would protect funds from being "dissipated" or "endangered." See also United States v. Huff, 873 F.2d 709, 713 (3d Cir.1989) (refusing to construe sentencing guidelines "in a manner which may lead to an absurd consequence"); Government of Virgin Islands v. Berry, 604 F.2d 221, 225 (3d Cir.1979) (" 'All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence.' " (quoting United States v. Kirby, 74 U.S. (7 Wall.) 482, 486, 19 L.Ed. 278 (1868))).
 
 
 46
 Thus, construing section 206(d)(1) as limiting the remedies provided to beneficiaries by section 409(a) anomalously would deny beneficiaries of pension funds protection under ERISA that was available under prior law, an interpretation of ERISA which the Supreme Court has disfavored. See Firestone, 489 U.S. at 114, 109 S.Ct. at 956 (rejecting "reading of ERISA" which "would require us to impose a standard of review that would afford less protection to employees and their beneficiaries than they enjoyed before ERISA was enacted"). Therefore permitting the set-off in this case best implements Congress's purpose to guarantee pension beneficiaries the broadest protection possible against fiduciaries who breach their fiduciary duties to a pension fund and thereby cause it losses.[13]
 
 
 47
 In seeking to avoid this result, Coar suggests that we should construe section 409(a) narrowly as creating only a cause of action without authorizing a method of recovery. In the first place, the language of the provision belies such an interpretation because it speaks of remedies as well as a pensioner's right to bring suit. In fact, the text implies that courts should apply whatever remedies seem equitable under the circumstances of a given case. More importantly, Coar's proffered construction leads only to fruitless question begging. Given this context, because Congress created a right, it probably intended to create a remedy. Thus, accepting Coar's suggested reading of section 409(a) would not solve our problem, but instead would place us in the same situation as at the beginning of our inquiry; namely, forcing us to ask again what remedy does section 409(a) authorize?
 
 
 48
 Likewise, unlike the district court and Coar, we do not attach significance to the fact that Congress has created some exceptions to section 206(d)(1), such as in the domestic relations context, see section 104(a) of ERISA, 29 U.S.C. § 1056(d) (creating exception to section 206's anti-alienation provision for qualified domestic relations orders), without creating an exception for the situation in this case. To start with, of course, inasmuch as a set-off is not an alienation, then the absence of an exception allowing a set-off to the restraint on alienation is meaningless. Furthermore, we do not find that Congress's failure to pass legislation to create an exception to section 206(d) that would cover this situation to be a persuasive indicator of its intent. The Supreme Court previously has admonished the lower courts not to read Congress's refusal to amend ERISA as necessarily indicative of a particular intent. "Congressional inaction lacks 'persuasive significance' because 'several equally tenable inferences may be drawn from such inaction.' " Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 650, 110 S.Ct. 2668, 2678, 110 L.Ed.2d 579 (1990) (quoting United States v. Wise, 370 U.S. 405, 411, 82 S.Ct. 1354, 1359, 8 L.Ed.2d 590 (1962)). This is particularly true in our case where, as discussed above, our examination of other available statutory evidence compels the conclusion that Congress would not have intended to forbid a set-off.
 
 V. CONCLUSION
 
 49
 We will reverse the order of June 23, 1992, appealed at Docket No. 92-5356, and will remand the case to the district court for entry of judgment in favor of the Fund Defendants. We will dismiss the Fund Defendants' second appeal at Docket No. 92-5438 as both unnecessary and untimely. In view of our disposition, Coar's cross-appeals from the district court's denial of attorney's fees are moot, as he makes no contention that he is entitled to fees if the Fund Defendants are successful on the merits. See Midnight Sessions, Ltd. v. City of Philadelphia, 945 F.2d 667, 675 (3d Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1668, 118 L.Ed.2d 389 (1992); Ingersoll-Rand Financial Corp. v. Anderson, 921 F.2d 497, 504 n. 11 (3d Cir.1990). Furthermore, his first cross-appeal at Docket No. 92-5359 was premature. Thus, we also will dismiss the cross-appeals at Docket Nos. 92-5359 and 92-5439.
 
 
 50
 BECKER, Circuit Judge, concurring.
 
 
 51
 I do not agree with the majority that the language of § 409(a) of ERISA, 29 U.S.C. § 1109(a), is more specific (and hence serves as a better indication of congressional intent) than the language of § 206(d)(1) of ERISA, 29 U.S.C. § 1056(d)(1). The issue here is (involuntary) alienation, and in my view the statutory language dealing with alienation in § 206(d)(1) is more specific in that context than the language dealing with equitable remedies under § 409(a). In addition, with respect to the language concerning a trustee's personal liability to rectify his or her breach of fiduciary liability in § 409(a), I find that language to be as equally general as the anti-alienation provision of § 206(d)(1). In my view, neither § 409(a) nor § 206(d)(1) can be accurately characterized as more specific than the other and therefore warranting greater interpretive authority.
 
 
 52
 I also do not agree with the majority that the language of § 206(d)(1), and by extension Guidry v. Sheet Metal Workers Nat'l Pension Fund, 493 U.S. 365, 110 S.Ct. 680, 107 L.Ed.2d 782 (1990), can fairly be read as shielding only the beneficiaries' interest under the pension plan from third-party creditors and not second-party creditors, namely the Fund itself. In my view, the plain meaning of "may not be assigned or alienated" in § 206(a)(1) appears to apply equally to involuntary alienation by the Fund itself and to involuntary alienation initiated by a garnishing third-party. In other words, the plain meaning of § 206(d)(1) seems to encompass the involuntary alienation arising by reason of Coar's criminal fiduciary breach in the context of both a claim by the Fund and a claim by a garnishing third party.
 
 
 53
 All that said, I nonetheless concur in the judgment. I do so because I recognize that the Supreme Court in Guidry expressly left open the question before us, see 493 U.S. at 373, 110 S.Ct. at 685, and, consistent with the observation of the majority opinion, see Majority at 1420, I cannot conceive that Congress intended that someone in the position of Mr. Coar (in contrast to any of his survivors) should be able to receive pension benefits from the Fund he had so extensively defrauded (at least until the amount taken was repaid). As Judge Nickerson observed, reaching the same conclusion in a post-Guidry case, see Pension Benefit Guar. Corp. v. Solmsen, 743 F.Supp. 125 (E.D.N.Y.1990), such a result would make no sense. See Sutherland, Statutory Construction § 363 (2d ed. 1904) (a statute should not be interpreted to create absurd results); accord Robert Winzinger, Inc. v. Management Recruiters of Bucks County, Inc., 841 F.2d 497, 500 (3d Cir.1988). This result would be particularly counter-intuitive given that we are interpreting a statute, ERISA, the broad purpose of which is to protect and ensure the availability of pension funds for retirees. As the majority opinion acknowledges, to allow Coar to collect his pension from the very Fund he defrauded would detract from this overriding purpose of ERISA.
 
 SUR PETITION FOR REHEARING
 
 54
 May 11, 1993.
 
 
 55
 Before: SLOVITER, Chief Judge, and BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH, LEWIS, and WEIS, Circuit Judges.
 
 
 56
 The petition for rehearing filed by the appellee-cross appellant Robert J. Coar in the above captioned matters having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the court in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.
 
 
 
 [1]
 Coar's conviction was affirmed on appeal, and he served 18 months in prison
 
 
 [2]
 We understand from the Fund Defendant's representations at oral argument that this case concerns only the monthly benefits due Coar during his lifetime, because the Fund Defendants take the position that they may not set off their claim against any benefits due Coar's survivors
 
 
 [3]
 While the Fund Defendants also moved for relief under Fed.R.Civ.P. 60, the court held that its motion should be considered under Rule 59
 
 
 [4]
 Express exceptions to this provision allow assignment for a "qualified domestic relations order" and "a voluntary and revocable assignment of not to exceed 10 percent of any benefit payment." 29 U.S.C. § 1056(d)(2), (3)
 
 
 [5]
 Coar does not dispute that he was a fiduciary who owed a duty to the Pension Fund, nor does he deny that he breached that duty. Furthermore, Coar does not contend that the anti-alienation provision of the Pension Fund plan was broader than required by section 206(d)(1) and he does not seek to uphold the judgment by contending that the district court erred in its holding with regard to the anti-forfeiture provision. Section 203(a) of ERISA, 29 U.S.C. § 1053(a) ("each pension plan shall provide that an employee's right to his normal retirement income is nonforfeitable upon the attainment of normal retirement age ...")
 
 
 [6]
 Further post-Guidry support for this result also may be found in New Jersey v. Pulasty, 259 N.J.Super. 274, 612 A.2d 952 (1992)
 
 
 [7]
 Contrary to Coar's argument, Patterson v. Shumate, --- U.S. ----, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992), does not suggest an opposite interpretation of Guidry. It is true that the Court in Patterson stated that "this Court itself vigorously has enforced ERISA's prohibition on the assignment or alienation of pension benefits, declining to recognize any implied exceptions to" section 206(d)(1). --- U.S. ----, 112 S.Ct. at 2247 (citing to Guidry). Further, the Court also declared, "We have previously declined to recognize any exceptions to ERISA's anti-alienation provision outside the bankruptcy context." Id. at ----, 112 S.Ct. at 2250 (citing to Guidry ) (emphasis in original). But, again as with Guidry, Patterson did not deal with a trustee who breached a fiduciary duty to the pension fund. Instead, it concerned a claim by a bankruptcy trustee who sought to have the debtor's pension benefits paid to the estate rather than to the debtor himself. Section 541(c)(2) of the Bankruptcy Code provides that a restriction on the transfer of a beneficial interest of a debtor in a trust enforceable under nonbankruptcy law is enforceable in a bankruptcy proceeding. 11 U.S.C. § 541(c)(2). The bankruptcy trustee argued that "non-bankruptcy law" only referred to state law and not to trusts governed by ERISA. The Court disagreed and further held that the anti-alienation provisions of section 206(d)(1) of ERISA satisfied the literal terms of section 541(c)(2) of the Bankruptcy Code. Thus, the debtor's interest in the ERISA plan was excluded from the estate
 
 
 [8]
 The regulations do treat a voluntary assignment to the plan as security for a loan from the plan as an alienation but we are not concerned with that provision in this case which, of course, deals with an involuntary set-off. 26 C.F.R. § 1.401(a)-13(d)(2) (1992)
 
 
 [9]
 It seems to us that if section 206(d)(1) is not applicable, then as a matter of federal common law under ERISA, a concept we discuss below, a court would allow the set-off by following established trust law. As we indicated in footnote 8, supra, we are not concerned with whether a voluntary assignment is an alienation
 
 
 [10]
 The parties understandably do not focus on the distinction between the amounts Coar owes under the ERISA and RICO judgments. Neither will we because the description given by Coar of his limited assets and income convinces us that it would be unrealistic to anticipate that he ever will pay the $25,535,887 ERISA judgment. We acknowledge, however, that there might in theory be a distinction between the judgments to the extent that the set-off is justified by section 409(a). Of course, if the action of the fund in setting off Coar's benefits against his debt was not an alienation, then there would not even be a theoretical distinction between the two aspects of the judgment
 
 
 [11]
 Interestingly, in reaching this conclusion, the Burr court held that a state law similar to section 206(d)(1) of ERISA, precluding the assignment of a beneficiary's interest, did not apply because "[i]t was not intended to protect a dishonest fiduciary in the retention of income otherwise payable to [the beneficiary] from the trust." 257 N.Y.S. at 657
 
 
 [12]
 Coar emphasizes that in our opinion in his criminal appeal we found "no evidence that the government could or did show that the pension fund lost money, either from its corpus or Omni's guaranteed rate of return." United States v. Zauber, 857 F.2d at 144. However, the Pension Fund is not bound by the government's proofs at a criminal trial at which it was not a party. In its action against Coar, the Pension Fund established that it had actual losses under ERISA of $25,585,887
 
 
 [13]
 We recognize that it is possible that a pension fund might in circumstances which arguably are premature set off benefits such as when it claims nothing more than that a trustee made an unwise investment and the trustee disputes that claim. We are, however, not concerned with that type of situation in this case, for the fund did not set off until after it obtained a summary judgment on liability so that it was obvious that Coar would be indebted to it under ERISA. Accordingly, we are not required to determine the earliest point at which a set-off is justifiable because whatever that point may be, it was passed in this case